# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

ALAN BIRD,

        Plaintiff,

v.                                CIVIL ACTION NO.   3:13-9546

AETNA LIFE INSURANCE COMPANY,
a Connecticut corporation licensed to do
business in West Virginia,

        Defendant.

## MEMORANDUM OPINON AND ORDER

Pending before the Court is Plaintiff Alan Bird and Defendant Aetna Life Insurance Company's cross-motions for summary judgment. ECF Nos. 19 & 14, respectively. For the following reasons, the Court **GRANTS** summary judgment in favor of Plaintiff and **DENIES** summary judgment in favor of Defendant.

## I.
## FACTS

Plaintiff began working for Praxair, Inc. as a production technician in 1992, and he ceased working in 2008. He has a GED and a CDL-Class A trucker's license. Defendant approved short-term disability benefits beginning on March 1, 2008, after Plaintiff stopped working because of chest pain. On March 24, 2008, Plaintiff underwent a triple by-pass and left internal mammary artery graft. On March 27, 2008, Plaintiff had a pacemaker implanted for sick sinus syndrome. Plaintiff was then awarded long-term disability benefits beginning August 30, 2008.

Plaintiff also received treatment for low-back pain from Dr. Jonathan Lilly, of Dunbar Medical Associates, PLLC, from at least November 24, 2008[1] through July 19, 2011, and from Dr. Timothy Deer, of Saint Francis Hospital's Center for Pain Relief, from at least August of 2008 throughout the time a decision was rendered by Defendant. In a progress note dated August 1, 2008, Dr. Deer noted Plaintiff reported pain to be 8 out of 10 most of the time. He stated he had no surgical options and failed injection and physical therapy and oral medication. On August 14, 2008, Plaintiff had a spinal cord stimulation system implanted. On June 10, 2009, Dr. Jonathan Lilly conducted a follow-up visit with Plaintiff. He assessed Plaintiff with hypertension, coronary artery disease, chronic back pain, and depressive disorder.

Dr. Christopher Kim, of Saint Francis Hospital's Center for Pain Relief, examined Plaintiff on August 26, 2010. Dr. Kim found Plaintiff weighed 300 pounds and had significant low-back tenderness below L4, some tenderness upon compression at L5 and S1, and mild tenderness at the left side of S1. He found no peripheral edema, but he noted Plaintiff walked with an antalgic gait, with a limited range of motion. Dr. Kim examined Plaintiff again on February 15, 2011, and noted tenderness in the low-back region and Plaintiff had significant use of a cane, with a slightly antalgic gait. Similar findings were made upon examination by Dr. Kim on April 26, 2011.

---

[1] Dr. Lilly's progress note from November 24, 2008, provides Plaintiff was examined as a follow-up visit for chronic and low-back pain and coronary artery disease.

-2-

On August 23, 2010, Dr. Naresh Sharma, a board certified anesthesiologist with expertise in pain management, completed a physician's review on behalf of Defendant. He noted Plaintiff's prior heart surgery and pacemaker implantation and the fact he suffers from "chronic thoracolumbar backache, recurrent myosfascial strain and sprain, multilevel degenerative disc disease and non-industrial related multiple comorbidities such has [sic] high blood pressure, coronary artery disease, diabetes, and idiopathic peripheral neuropathy." *Physician Review by Dr. Shrama*, at 2 (Aug. 23, 2010) (ECF No. 8-1, at 173). However, Dr. Sharma opined these conditions resulted in no functional impairment from August 30, 2010 through August 30, 2011 because Plaintiff's heart condition was treated and "there is no documentation of significant pathology such as severe disc herniation, severe spondyiolisthesis, or gross instability of the lumbosacral spine that would indicate towards the presence of functional impairment[,]" and narcotics helped with symptoms and improved functionality. *Id*. at 3 (ECF No. 8-1, at 174). Dr. Sharma further stated he spoke with Dr. Deer who agreed there is no current functional impairment.

On the same day Dr. Sharma wrote his review, Dr. Deer wrote a letter regarding his conversation with Dr. Sharma about Plaintiff's disability status. Dr. Deer stated Plaintiff has "severe peripheral neuropathy, radiculopathy, disc disease and multiple conditions with his heart." *Letter from Dr.* Deer (Aug. 23, 2010) (ECF No. 8-1, at 127). Dr. Deer opined Plaintiff appeared to be "disabled on both a temporary and permanent basis," but he referred Plaintiff for a neurosurgical consult with Dr. Mark Shaffrey, a neurosurgeon with the Department of

-3-

Neurological Surgery of the University of Virginia, to see if there was a possible resolution of Plaintiff's problems. *Id.*

On August 3, 2010, Dr. Shaffrey evaluated Plaintiff's back at Dr. Deer's request. He reviewed Plaintiff's CT scan, which showed some mild degenerative changes at the L5-S1 region with enlarged facet joints. On September 2, 2010, Dr. Shaffrey reviewed a lumbar CT/myelogram of Plaintiff and opined there was no definitive area of decompression that would help him.

On September 1, 2010, Dr. Deer wrote a letter to a claim analyst with Defendant and stated he reviewed the findings of Dr. Sharma and said there was confusion between himself and Dr. Sharma. Dr. Deer stated he believed Plaintiff "is permanently and totally disabled based on his chronic peripheral nerve pain, chronic spinal radiculopathy and chronic cardiovascular abnormalities." *Letter from Dr. Deer* (Sept. 1, 2010) (ECF No. 8-1, at 128). However, he said his opinion may change if Dr. Shaffrey can perform corrective surgery. Treatment notes from Dr. Deer on October 25, 2010, state Plaintiff was evaluated by Dr. Shaffery, but he was found not to be a candidate for surgery.

On October 2, 2010, Maria Provini-Sales completed a vocational assessment of Plaintiff. Based upon the peer review conducted by Dr. Sharma, in which he found no restrictions or limitations, Ms. Provini-Sales identified four occupations Plaintiff can perform, three of which are above the target wage of $14.32 per hour.

-4-

On April 5, 2011, Dr. Robert Walker, a Board Certified Specialist in Occupational Medicine, performed an independent medical examination (IME) of Plaintiff at Defendant's request. Dr. Walker's report found Plaintiff's lumbar myelogram and CT scan show mild degenerative changes and some foraminal stenosis of the lumbar spine, "which do not preclude severe chronic pain." *Independent Medical Examination of Dr. Walker* at 1 & 3 (April 5, 2011) (ECF No. 8-1, at 53 & 55). He noted that Plaintiff's "main limitation is chronic pain," for which he takes 60 mg. of morphine daily (30 mg. of MS Contin once daily and 15 mg. of MS Contin twice daily), 20 mg. of Cymbalta daily, and he uses a "breakthrough medication consisting of oxycodone and acetaminophen as needed."[2] *Id*. at 2 (ECF No. 8-1, at 54). Dr. Walker stated Plaintiff's spinal cord stimulator had failed and "multiple invasive pain relief procedures from a pain specialist, . . . also did not provide any relief." *Id*. at 1 (ECF No. 8-1, at 53). Dr. Walker reported Plaintiff said "he spends most of his time in a chair and has gained a large amount of weight. He does drive, but only for short distances. He can feed himself, dress himself, and bathe himself, occasionally needing help putting on his shoes and socks. He does awaken his children in the morning when his wife goes to work." *Id*. at 1-2 (ECF No. 8-1, 54). Dr. Walker noted Plaintiff's gait was slightly antalgic, and he walked with a cane. Dr. Walker found Plaintiff "is limited significantly in crawling, kneeling, lifting, lifting weight over 20 lb, carrying, twisting, and bending. He can provide hand function in an unlimited fashion." *Id.* Dr. Walker did not find Plaintiff was limited by his diabetes or cardiac disease. Based upon his review, Dr. Walker opined Plaintiff "could, in fact, engage in sedentary employment with frequent sit-stand option

---

[2]Dr. Walker also noted Plaintiff takes a number of other medications, which primarily treat his cardiac condition.

beginning at 6 hours and expanding to 8 hours per day." *Id*. On the Capabilities and Limitations Form completed by Dr. Walker, he wrote Plaintiff could "begin at 4 to 6 hrs and work-up to 8-hr employment [with] above conditions." *Capabilities and Limitations Form* (ECF No. 8-1, at 56).

On May 26, 2011, Dr. Walker submitted an addendum to his report stating he believed Plaintiff could work 4 to 6 hours per day for a period of three to four weeks. After this period of time, Dr. Walker opined Plaintiff "is determined capable of working 8 hours per day." *Independent Medical Examination – Addendum* by Dr. Walker (May 26, 2011) (ECF No. 8-1, at 57).

Ms. Provini-Sales reviewed Plaintiff's case again in 2011[3] based upon Dr. Walker's evaluation in which he found Plaintiff "can engage in sedentary employment with frequent sit/stand option beginning at 6 hours and expanding to 8 hours per day" with a target wage of $19.33 per hour. *Report of Ms. Provini-Sales* (ECF No. 8-1, at 43) (internal quotation marks omitted). Based upon these criteria, Ms. Provini-Sales identified occupations Plaintiff could perform, but those positions paid less than the target wage. The target wage rate was then adjusted down to $14.49.[4] By a report dated June 15, 2011, Ms. Provini-Sales found there are sedentary jobs Plaintiff could perform that would meet the target wage.

---

[3]The referral date listed on the Report is April 18, 2011, but the date of the report is left blank.

[4]The target wage of $19.22 an hour reflected working less than eight hours a day for the initial three to four week period suggested by Dr. Walker. The wage was reduced based upon an eight hour day.

On July 8, 2011, Plaintiff had a lumbar CT scan performed. The scan showed no compression factures or deformity, normal alignment, preserved vertebral body heights, and normal spinal cord diameter. However, it also showed a small cyst at the inferior aspect of the L4 vertebral body, facet joint degenerative changes at L4-5, and a slight levoscoliosis.

On August 22, 2011, Dr. Deer stated in a progress note that he believed Plaintiff was permanently and totally disabled "due to his multiple medical issues to include severe peripheral neuropathy, diabetes, heart disease, arrhythmia, and pacemaker placement." *Dr. Deer's Treatment Note*, at 4 & 5 (ECF No. 8-1, at 146-47).

Based upon Dr. Walker's report and the vocational assessment, Defendant sent Plaintiff a letter dated July 8, 2011, terminating his LTD benefits. Defendant found Plaintiff did not qualify for continued disability benefits under the terms of the Plan for a claim exceeding 24 months because there were jobs within his physical capacity and target wage. In this regard, the Plan provides that after 24 months of disability, continuation of coverage requires Plaintiff to not be "able to work at any reasonable occupation solely because of disease or injury and earn less than 60% of . . . [his] adjusted pre-disability earnings." *Letter from Aetna*, at 1 (July 8, 2011) (ECF No. 8-1, at 60). Although Defendant recognized Plaintiff was awarded Social Security Disability Income (SSDI) benefits, it did not give that determination significant weight because it was not provided the basis for the SSDI decision and the decision was based upon Social Security Administration (SSA) regulations, which may not be relevant to Defendant's decision.

By letter dated January 6, 2012, counsel for Plaintiff asked Defendant to reconsider its decision of July 11, 2011. On January 9, 2012, Dr. Deer sent a letter to counsel stating as follows:

> At this time I believe that Mr. Bird remains permanently and totally disabled and will remain so throughout the remainder of his life. This is based on my update that he had severe pain in his back and legs that is not curable and is requiring oral Morphine. We have tried more conservative routes of treatment without improvement and his pain is quite severe and in a neuropathic process. He has both peripheral nerve pain as well as spinal pain. This is attenuated by his severe cardiovascular abnormalities which make it very difficult for him to function or to do any type of exercising to benefit his overall health. He has disk disease, nerve impingement, nerve abnormality and ischemic problems as well as cardiovascular abnormalities.
>
> To summarize, the patient is permanently and totally disabled from both his musculoskeletal and neurologic problems as well as his co-existing health issues.

*Letter from Dr. Deer* (Jan. 9, 2012) (ECF No. 8-1, at 154).

Thereafter, Dr. Robert Swotinsky, a board certified physician in occupational medicine, conducted a peer review of Plaintiff's medical records on April 7, 2012, on behalf of Defendant. In reviewing Dr. Deer's findings, Dr. Swotinsky stated the CT myelogram performed on August 24, 2010, showed clinically insignificant degenerative changes to Plaintiff's back, and it did not reveal any deformity or neurologic impingement. Dr. Swotinsky further stated he could not reconcile Dr. Deer's finding of left L5-S1 sensory loss with the testing. Dr. Swotinsky said Plaintiff's complaints of low-back tenderness were subjective complaints, with "no objective and/or measured limitations." *Physician Review of Dr. Swotinsky*, at 6 (April 7, 2012) (ECF No. 8-1, at 9). He noted Plaintiff's strength was preserved, he suffered no muscle atrophy, and most

providers found no loss of sensation. In addition, he found other providers stated in their reports that Plaintiff was using a cane, "but none have indicated that the claimant actually needs a cane to walk, or why." *Id*. Although Plaintiff had a triple-bypass and has a pacemaker, Dr. Swotinksy stated his nuclear stress test showed a 64% ejection fraction (normal), with no ischemic changes. Therefore, based upon his review of the records, Dr. Swotinsky opined Plaintiff could perform the occupations identified in the transferrable skills analysis.

Plaintiff was seen at the pacemaker clinic of South Charleston Cardiology on June 17, 2011. A letter from the clinic to Plaintiff's treating cardiologist, Dr. Kishore Challa, stated Plaintiff had normal sinus rhythm, but he was pacemaker dependent.

On June 27, 2012, Defendant sent a letter to Plaintiff's counsel stating it was upholding its termination of Plaintiff's LTD benefits, effective July 1, 1011. In the letter, Defendant stated the records establish Plaintiff's diabetes is under good control and thallium stress results show no ischemia and normal ejection fraction of his heart. With respect to his low-back, Defendant stated his complaints about tenderness over his low-back are subjective and not supported by "objective and/or measured limitations." *Letter from Defendant*, at 2 (June 27, 2012) (ECF No. 8-9, at 1416). Defendant further stated:

> Strength is preserved and there is no muscle atrophy. The CT myelogram performed on August 24, 2010, showed some degenerative changes of the L5-S1 disc, but showed no nerve root or cord compromise, nor did it show curvature of the spine or neurologic impingement, e.g. nerve root impingement; the imaging tests in the file did not demonstrate neither outcome. Dr. Deer stated that Mr. Bird is disabled in part by severe peripheral neuropathy and has decreased sensation in the "leg/foot."

> However, by contrast, Drs. Kim, Walker, and Shaffrey state that your client has normal sensation in both legs. The providers noted in the records that your client has been using a cane to walk, but none have indicated that Mr. Bird actually needs a cane to walk, or why.

*Id.* at 2-3 (R. 1416-17). Defendant also said it would not give significant weight to Plaintiff's SSDI award because Defendant did not know that basis of the award and SSA regulations are different than long-term disability criteria.

## II.
## STANDARD OF REVIEW

In this case, the parties agree that this Court's review falls under the abuse of discretion standard. Under an abuse of discretion standard, "the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if . . . [a] court would have come to a different conclusion independently." *Ellis v. Metro Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (citations omitted).[5] The plan administrator's decision is reasonable when it is the result of "a deliberate, principled reasoning process" and when it is supported by substantial evidence. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (internal quotation marks and citations omitted). In considering whether an administrator abused its discretion, the Fourth Circuit identified in *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), a number of non-exclusive factors that a court may consider. These factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and

---

[5]*Abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

>with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43 (footnote omitted).

In *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court further explained that "[i]f a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be weighed *as a factor in determining whether there is an abuse of discretion*." 554 U.S. at 111 (italics added in *Metropolitan Life*; quoting, in part, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, at 115 (1989); internal quotation marks and other citation omitted)). In this case, Defendant operates as both the administrator and the insurer. Therefore, the Court will consider the conflict of interest "as a factor in determining whether there is an abuse of discretion." *Id*.

### III.
### DISCUSSION

Plaintiff contends that his benefits were wrongfully terminated because Defendant's decision was based upon Dr. Walker's speculation that Plaintiff will be able to work an eight hour day in the future. Plaintiff argues Dr. Walker's speculation is absurd given his significant cardiac and back problems, and consistent complaints of pain.[6] Plaintiff asserts this

---

[6]Plaintiff references an internal e-mail which states that Dr. Doyle, who participated in an in-house review, "felt that the cardiac condition was significant and that we should request all those records from the past two years. He feels there is a good chance that TD will be supported on the cardiac alone; however, if it does not, then we would have to consider an exam to fully

-11-

speculation also resulted in an unreliable vocational assessment because it is based upon a contrived eight hour day, which lowered his target wage, generating jobs in the marketplace the vocational expert opined he could perform.[7] Plaintiff further insists that Defendant improperly questioned his use of a cane, when there is no medical evidence indicating he does not need a cane.

Defendant responds that Dr. Walker's opinion was not pure speculation. In his April 5, 2011 report, Dr. Walker specifically stated Plaintiff "could, in fact, engage in sedentary employment with frequent sit-stand option beginning at 6 hours and expanding to 8 hours per day.

---

evaluate his back condition." *E-mail from Darlene V. Maxwell to Bianca A. Lopez* (Feb. 9, 2011) (ECF No. 8-7, at 201). Subsequently, at a meeting held on February 22, 2011, Dr. Doyle found there was no cardiac impairment based on recent testing. At the conclusion of that meeting, it was recommended that an independent medical examination be performed, which ultimately was conducted by Dr. Walker.

[7]Plaintiff raises a number of other issues in the record. First, Plaintiff states Dr. Walker's report is flawed because he states Plaintiff cannot lift more than 20 pounds, but he can perform sedentary work. Plaintiff asserts the Dictionary of Occupational Titles classifies sedentary work as lifting no more than ten pounds. However, the fact that Dr. Walker found Plaintiff can lift *more than* someone who qualifies for sedentary work does not mean Plaintiff cannot perform sedentary work. Second, Plaintiff points out that Defendant does not mention Dr. Sharma's opinion that he did not have any functional impairment. Plaintiff argues the reason why Dr. Sharma's opinion is not mentioned is because it is not credible in light of his medical history. Defendant responds that it reviewed the entire record, but it is not required to include every medical record in its denial letter. The Court agrees with Plaintiff that Dr. Sharma's opinion of no functional impairment is inconsistent with the medical evidence in this case, but the Court finds no abuse of discretion where Defendant did not even cite what Plaintiff finds objectionable in its denial letter. Third, Plaintiffs points out that Defendant does not mention Dr. Swotinsky by name in its decision, but it cites inconsistencies in medical treatment records reviewed by him. Plaintiff asserts Defendant does not mention him because his opinion about Plaintiff's ability to work is not credible. Again, however, the Court will not find an abuse of discretion based upon information Plaintiff believes is not credible when Defendant did not rely upon that specific opinion in the decision.

This is within the activity the claimant is showing within the home at this time." *Independent Medical Examination of Dr. Walker* at 2 (ECF No. 8-1, at 54). Defendant contends that Dr. Walker thoroughly considered Plaintiff's cardiac and back problems, pain, and his other conditions and determined he could perform sedentary employment with a frequent sit-stand option. Thus, Defendant asserts its reliance upon Dr. Walker's reports was completely reasonable. In addition, Defendant states it extensively considered and addressed Dr. Deer's opinions in its denial letter, but noted many of the findings were inconsistent with the findings of other providers and/or not supported by medical evidence.

Upon review, the Court finds Dr. Walker's IME and Addendum are not conclusive as to whether or not Plaintiff will be able to work an eight hour day. It seems doubtful that Dr. Walker would have recommended him starting at a four to six hour a day level, if he already believed he was working at the eight hour level in the home. In fact, Dr. Walker's description of the activities Plaintiff stated he was doing in the home do not appear consistent with an eight hour day. The Addendum submitted by Dr. Walker on May 26, 2011, does not help the Court resolve the issue. In the Addendum, Dr. Walker states Plaintiff "would be capable of working 8 hours per day, but could begin working at only 4-6 hours per day, and gradually work up to 8 hours a day, with the limitations noted in my report." *Independent Medical Examination – Addendum* by Dr. Walker (May 26, 2011) (ECF No. 8-1, at 57). It appears inconsistent to state that Plaintiff currently can work eight hours a day, but then say he will need time to work up to that level. Making it more questionable, Dr. Walker then states: "To clarify, the length of the period that Mr. Bird can work 4-6 hours per day should be for a duration of three to four weeks, from the time

the report was issued on April 5, 2011. After this three to four week period of working 4-6 hours per day, Mr. Bird is determined capable of working 8 hours per day." *Id.* There is nothing in the record to suggest that Dr. Walker ever reexamined Plaintiff to see if, indeed, he was capable of working eight hours a day at the end of April and/or beginning of May in 2011. Moreover, based upon a thorough review of the record in this case, the Court finds the medical evidence does not support such a conclusion.

Plaintiff is an obese male with long and consistent reports of severe chronic back pain, who has not worked since 2008 when he underwent triple-bypass heart surgery. With respect to his back pain, Dr. Walker stated himself that findings on his lumbar myelogram and CT scans "do not preclude severe chronic pain[,]" for which Plaintiff takes a "heavy dose of opiate mediation[.]" *Independent Medical Examination of Dr. Walker*, at 55 (ECF No. 8-1, at 55). Plaintiff also had a spinal cord stimulation system implanted in 2008, which Dr. Walker noted did not work, and he is not a candidate for surgery. Although Defendant questioned Plaintiff's use of a cane (in light of Dr. Swotinsky's comment in a peer review), Plaintiff's antalgic gate and chronic pain are mentioned frequently in the record, and no examining physician ever questioned his sincere use of a cane. In addition, although it is true that Plaintiff had normal infraction rates in his heart, he was found to be pacemaker dependent in June of 2011. Upon review of the totality of the medical evidence, the Court finds Defendant's reliance upon Dr. Walker's unclear statements about Plaintiff's ability to work was unreasonable and Defendant's decision to terminate Plaintiff's long-term disability benefits was not supported by substantial evidence. The Court finds the overwhelming evidence in this case demonstrates Plaintiff is totally disabled under the

terms of the Plan. Therefore, the Court finds Defendant abused its discretion in terminating Plaintiff's long-term disability benefits under the terms of the Plan.

### III.
### CONCLUSION

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **DIRECTS** Defendant to pay Plaintiff his long-term disability benefits from the date of termination until such time as he recovers or is no longer entitled to benefits under the Plan. The Court further **ORDERS** Defendant to pay interest on the past-due amount.

The Court **DIRECTS** the Clerk to send a certified copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER: March 31, 2014

_____
ROBERT C. CHAMBERS, CHIEF JUDGE